April 19, 1995
United States Court of Appeals United States Court of Appeals
For the First Circuit For the First Circuit

No. 93-2214

LOTUS DEVELOPMENT CORPORATION,

Plaintiff, Appellee,

v.

BORLAND INTERNATIONAL, INC.,

Defendant, Appellant.

ERRATA SHEET ERRATA SHEET

The opinion of this court issued on March 9, 1995, is amended as

follows:

On page 38, line 16: Change "See id. at 562." to "See id. at

562. But see Campbell v. Acuff-Rose Music, Inc., 114 S. Ct. 1164,

1174 (1994)."

United States Court of Appeals United States Court of Appeals

For the First Circuit For the First Circuit

No. 93-2214

LOTUS DEVELOPMENT CORPORATION,

Plaintiff, Appellee,

v.

BORLAND INTERNATIONAL, INC.,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Robert E. Keeton, U.S. District Judge]



Before

Torruella, Chief Judge,

Boudin and Stahl, Circuit Judges.

Gary L. Reback, with whom Peter N. Detkin, Michael Barclay,

Isabella E. Fu, Wilson Sonsini Goodrich & Rosati, Peter E. Gelhaar,

Katherine L. Parks, and Donnelly Conroy & Gelhaar, were on brief for

appellant.

Matthew P. Poppel, et. al, were on brief for Computer Scientists,

amicus curiae.

Dennis S. Karjala and Peter S. Menell on brief, amici curiae.

Jeffrey C. Cannon and Baker Keaton Seibel & Cannon were on brief

for Computer Software Industry Association, amicus curiae.

Laureen E. McGurk, David A. Rabin, Bryan G. Harrison and Morris

Manning & Martin were on brief for Chicago Computer Society, Diablo

Users Group, Danbury Area Computer Society, IBM AB Users Group,

Kentucky-Indiana Personal Computer Users Group, Long Island PC Users

Group, Napa Valley PC Users Group, Pacific Northwest PC Users Group,

Palmetto Personal Computer Club, Philadelphia Area Computer Society,

Inc., Phoenix IBM PC Users Group, Pinellas IBM PC Users Group, Quad

Cities Computer Society, Quattro Pro Users Group, Sacramento PC Users

Group, San Francisco PC Users Group, Santa Barbara PC Users Group,

Twin Cities PC Users Group, and Warner Robbins Personal Computer

Association, amici curiae.

Diane Marie O'Malley and Hanson Bridgett Marcus Vlahos & Rudy

were on brief for Software Entrepreneurs' Forum, amicus curiae.

Peter M.C. Choy was on brief for American Committee for

Interoperable Systems, amicus curiae.

Howard B. Abrams, Howard C. Anawalt, Stephen R. Barnett, Ralph S.

Brown, Stephen L. Carter, Amy B. Cohen, Paul J. Heald, Peter A. Jaszi,

John A. Kidwell, Edmund W. Kitch, Roberta R. Kwall, David L. Lange,

Marshall Leaffer, Jessica D. Litman, Charles R. McManis, L. Ray

Patterson, Jerome H. Reichman, David A. Rice, Pamela Samuelson, David

J. Seipp, David E. Shipley, Lionel S. Sobel, Alfred C. Yen, and Diane

L. Zimmerman were on brief for Copyright Law Professors, amicus

curiae.

Henry B. Gutman, with whom Kerry L. Konrad, Joshua H. Epstein,

Kimberly A. Caldwell, O'Sullivan Graev & Karabell, Thomas M. Lemberg,

James C. Burling, and Hale and Dorr, were on brief for appellee.

Morton David Goldberg, June M. Besek, David O. Carson, Jesse M.

Feder, Schwab Goldberg Price & Dannay, and Arthur R. Miller were on

brief for Apple Computer, Inc., Digital Equipment Corporation,

International Business Machines Corporation, and Xerox Corporation,

amici curiae.

Jon A. Baumgarten, Proskauer Rose Goetz & Mendelsohn, and Robert

A. Gorman were on brief for Adobe Systems, Inc., Apple Computer, Inc.,

Computer Associates International, Inc., Digital Equipment

Corporation, and International Business Machines Corporation, amici

curiae.

Herbert F. Schwartz, Vincent N. Palladino, Susan Progoff, Fish &

Neave, William J. Cheeseman, and Foley Hoag & Eliot, were on brief for

Computer and Business Equipment Manufacturers Association, amicus

curiae.

March 9, 1995



STAHL, Circuit Judge. This appeal requires us to STAHL, Circuit Judge.

decide whether a computer menu command hierarchy is

copyrightable subject matter. In particular, we must decide

whether, as the district court held, plaintiff-appellee Lotus

Development Corporation's copyright in Lotus 1-2-3, a

computer spreadsheet program, was infringed by defendant-

appellant Borland International, Inc., when Borland copied

the Lotus 1-2-3 menu command hierarchy into its Quattro and

Quattro Pro computer spreadsheet programs. See Lotus Dev.

Corp. v. Borland Int'l, Inc., 788 F. Supp. 78 (D. Mass. 1992)

("Borland I"); Lotus Dev. Corp. v. Borland Int'l, Inc., 799

F. Supp. 203 (D. Mass. 1992) ("Borland II"); Lotus Dev. Corp.

v. Borland Int'l, Inc., 831 F. Supp. 202 (D. Mass. 1993)

("Borland III"); Lotus Dev. Corp. v. Borland Int'l, Inc., 831

F. Supp. 223 (D. Mass. 1993) ("Borland IV").

I. I.

Background Background

Lotus 1-2-3 is a spreadsheet program that enables

users to perform accounting functions electronically on a

computer. Users manipulate and control the program via a

series of menu commands, such as "Copy," "Print," and "Quit."

Users choose commands either by highlighting them on the

screen or by typing their first letter. In all, Lotus 1-2-3

-3- 3

has 469 commands arranged into more than 50 menus and

submenus.

Lotus 1-2-3, like many computer programs, allows

users to write what are called "macros." By writing a macro,

a user can designate a series of command choices with a

single macro keystroke. Then, to execute that series of

commands in multiple parts of the spreadsheet, rather than

typing the whole series each time, the user only needs to

type the single pre-programmed macro keystroke, causing the

program to recall and perform the designated series of

commands automatically. Thus, Lotus 1-2-3 macros shorten the

time needed to set up and operate the program.

Borland released its first Quattro program to the

public in 1987, after Borland's engineers had labored over

its development for nearly three years. Borland's objective

was to develop a spreadsheet program far superior to existing

programs, including Lotus 1-2-3. In Borland's words, "[f]rom

the time of its initial release . . . Quattro included

enormous innovations over competing spreadsheet products."

The district court found, and Borland does not now

contest, that Borland included in its Quattro and Quattro Pro

version 1.0 programs "a virtually identical copy of the

entire 1-2-3 menu tree." Borland III, 831 F. Supp. at 212

(emphasis in original). In so doing, Borland did not copy

any of Lotus's underlying computer code; it copied only the

-4- 4

words and structure of Lotus's menu command hierarchy.

Borland included the Lotus menu command hierarchy in its

programs to make them compatible with Lotus 1-2-3 so that

spreadsheet users who were already familiar with Lotus 1-2-3

would be able to switch to the Borland programs without

having to learn new commands or rewrite their Lotus macros.

In its Quattro and Quattro Pro version 1.0

programs, Borland achieved compatibility with Lotus 1-2-3 by

offering its users an alternate user interface, the "Lotus

Emulation Interface." By activating the Emulation Interface,

Borland users would see the Lotus menu commands on their

screens and could interact with Quattro or Quattro Pro as if

using Lotus 1-2-3, albeit with a slightly different looking

screen and with many Borland options not available on Lotus

1-2-3. In effect, Borland allowed users to choose how they

wanted to communicate with Borland's spreadsheet programs:

either by using menu commands designed by Borland, or by

using the commands and command structure used in Lotus 1-2-3

augmented by Borland-added commands.

Lotus filed this action against Borland in the

District of Massachusetts on July 2, 1990, four days after a

district court held that the Lotus 1-2-3 "menu structure,

taken as a whole -- including the choice of command terms

[and] the structure and order of those terms," was protected

expression covered by Lotus's copyrights. Lotus Dev. Corp.

-5- 5

v. Paperback Software Int'l, 740 F. Supp. 37, 68, 70 (D.

Mass. 1990) ("Paperback").1 Three days earlier, on the

morning after the Paperback decision, Borland had filed a

declaratory judgment action against Lotus in the Northern

District of California, seeking a declaration of non-

infringement. On September 10, 1990, the district court in

California dismissed Borland's declaratory judgment action in

favor of this action.

Lotus and Borland filed cross motions for summary

judgment; the district court denied both motions on March 20,

1992, concluding that "neither party's motion is supported by

the record." Borland I, 788 F. Supp. at 80. The district

court invited the parties to file renewed summary judgment

motions that would "focus their arguments more precisely" in

light of rulings it had made in conjunction with its denial

of their summary judgment motions. Id. at 82. Both parties

filed renewed motions for summary judgment on April 24, 1992.

In its motion, Borland contended that the Lotus 1-2-3 menus

were not copyrightable as a matter of law and that no

reasonable trier of fact could find that the similarity

between its products and Lotus 1-2-3 was sufficient to

sustain a determination of infringement. Lotus contended in



1. Judge Keeton presided over both the Paperback litigation
and this case.

-6- 6

its motion that Borland had copied Lotus 1-2-3's entire user

interface and had thereby infringed Lotus's copyrights.

On July 31, 1992, the district court denied

Borland's motion and granted Lotus's motion in part. The

district court ruled that the Lotus menu command hierarchy

was copyrightable expression because

[a] very satisfactory spreadsheet menu
tree can be constructed using different
commands and a different command
structure from those of Lotus 1-2-3. In
fact, Borland has constructed just such
an alternate tree for use in Quattro
Pro's native mode. Even if one holds the
arrangement of menu commands constant, it
is possible to generate literally
millions of satisfactory menu trees by
varying the menu commands employed.

Borland II, 799 F. Supp. at 217. The district court

demonstrated this by offering alternate command words for the

ten commands that appear in Lotus's main menu. Id. For

example, the district court stated that "[t]he `Quit' command

could be named `Exit' without any other modifications," and

that "[t]he `Copy' command could be called `Clone,' `Ditto,'

`Duplicate,' `Imitate,' `Mimic,' `Replicate,' and

`Reproduce,' among others." Id. Because so many variations

were possible, the district court concluded that the Lotus

developers' choice and arrangement of command terms,

reflected in the Lotus menu command hierarchy, constituted

copyrightable expression.

-7- 7

In granting partial summary judgment to Lotus, the

district court held that Borland had infringed Lotus's

copyright in Lotus 1-2-3:

[A]s a matter of law, Borland's Quattro
products infringe the Lotus 1-2-3
copyright because of (1) the extent of
copying of the "menu commands" and "menu
structure" that is not genuinely disputed
in this case, (2) the extent to which the
copied elements of the "menu commands"
and "menu structure" contain expressive
aspects separable from the functions of
the "menu commands" and "menu structure,"
and (3) the scope of those copied
expressive aspects as an integral part of
Lotus 1-2-3.

Borland II, 799 F. Supp. at 223 (emphasis in original). The

court nevertheless concluded that while the Quattro and

Quattro Pro programs infringed Lotus's copyright, Borland had

not copied the entire Lotus 1-2-3 user interface, as Lotus

had contended. Accordingly, the court concluded that a jury

trial was necessary to determine the scope of Borland's

infringement, including whether Borland copied the long

prompts2 of Lotus 1-2-3, whether the long prompts contained



2. Lotus 1-2-3 utilizes a two-line menu; the top line lists
the commands from which the user may choose, and the bottom
line displays what Lotus calls its "long prompts." The long
prompts explain, as a sort of "help text," what the
highlighted menu command will do if entered. For example,
the long prompt for the "Worksheet" command displays the
submenu that the "Worksheet" command calls up; it reads
"Global, Insert, Delete, Column, Erase, Titles, Window,
Status, Page." The long prompt for the "Copy" command
explains what function the "Copy" command will perform:
"Copy a cell or range of cells." The long prompt for the
"Quit" command reads, "End 1-2-3 session (Have you saved your
work?)."

-8- 8

expressive elements, and to what extent, if any, functional

constraints limited the number of possible ways that the

Lotus menu command hierarchy could have been arranged at the

time of its creation. See Borland III, 831 F. Supp. at 207.

Additionally, the district court granted Lotus summary

judgment on Borland's affirmative defense of waiver, but not

on its affirmative defenses of laches and estoppel. Borland

II, 799 F. Supp. at 222-23.

Immediately following the district court's summary

judgment decision, Borland removed the Lotus Emulation

Interface from its products. Thereafter, Borland's

spreadsheet programs no longer displayed the Lotus 1-2-3

menus to Borland users, and as a result Borland users could

no longer communicate with Borland's programs as if they were

using a more sophisticated version of Lotus 1-2-3.

Nonetheless, Borland's programs continued to be partially

compatible with Lotus 1-2-3, for Borland retained what it

called the "Key Reader" in its Quattro Pro programs. Once

turned on, the Key Reader allowed Borland's programs to



Prior to trial, the parties agreed to exclude the
copying of the long prompts from the case; Lotus agreed not
to contend that Borland had copied the long prompts, Borland
agreed not to argue that it had not copied the long prompts,
and both sides agreed not to argue that the issue of whether
Borland had copied the long prompts was material to any other
issue in the case. See Borland III, 831 F. Supp. at 208.

-9- 9

understand and perform some Lotus 1-2-3 macros.3 With the

Key Reader on, the Borland programs used Quattro Pro menus

for display, interaction, and macro execution, except when

they encountered a slash ("/") key in a macro (the starting

key for any Lotus 1-2-3 macro), in which case they

interpreted the macro as having been written for Lotus 1-2-3.

Accordingly, people who wrote or purchased macros to shorten

the time needed to perform an operation in Lotus 1-2-3 could

still use those macros in Borland's programs.4 The district

court permitted Lotus to file a supplemental complaint

alleging that the Key Reader infringed its copyright.

The parties agreed to try the remaining liability

issues without a jury. The district court held two trials,

the Phase I trial covering all remaining issues raised in the

original complaint (relating to the Emulation Interface) and

the Phase II trial covering all issues raised in the

supplemental complaint (relating to the Key Reader). At the

Phase I trial, there were no live witnesses, although

considerable testimony was presented in the form of

affidavits and deposition excerpts. The district court ruled

upon evidentiary objections counsel interposed. At the Phase



3. Because Borland's programs could no longer display the
Lotus menu command hierarchy to users, the Key Reader did not
allow debugging or modification of macros, nor did it permit
the execution of most interactive macros.

4. See Borland IV, 831 F. Supp. at 226-27, for a more
detailed explanation of macros and the Key Reader.

-10- 10

II trial, there were two live witnesses, each of whom

demonstrated the programs for the district court.

After the close of the Phase I trial, the district

court permitted Borland to amend its answer to include the

affirmative defense of "fair use." Because Borland had

presented all of the evidence supporting its fair-use defense

during the Phase I trial, but Lotus had not presented any

evidence on fair use (as the defense had not been raised

before the conclusion of the Phase I trial), the district

court considered Lotus's motion for judgment on partial

findings of fact. See Fed. R. Civ. P. 52(c). The district

court held that Borland had failed to show that its use of

the Lotus 1-2-3 menu command hierarchy in its Emulation

Interface was a fair use. See Borland III, 831 F. Supp. at

208.

In its Phase I-trial decision, the district court

found that "each of the Borland emulation interfaces contains

a virtually identical copy of the 1-2-3 menu tree and that

the 1-2-3 menu tree is capable of a wide variety of

expression." Borland III, 831 F. Supp. at 218. The district

court also rejected Borland's affirmative defenses of laches

and estoppel. Id. at 218-23.

In its Phase II-trial decision, the district court

found that Borland's Key Reader file included "a virtually

identical copy of the Lotus menu tree structure, but

-11- 11

represented in a different form and with first letters of

menu command names in place of the full menu command names."

Borland IV, 831 F. Supp. at 228. In other words, Borland's

programs no longer included the Lotus command terms, but only

their first letters. The district court held that "the Lotus

menu structure, organization, and first letters of the

command names . . . constitute part of the protectable

expression found in [Lotus 1-2-3]." Id. at 233.

Accordingly, the district court held that with its Key

Reader, Borland had infringed Lotus's copyright. Id. at 245.

The district court also rejected Borland's affirmative

defenses of waiver, laches, estoppel, and fair use. Id. at

235-45. The district court then entered a permanent

injunction against Borland, id. at 245, from which Borland

appeals.

This appeal concerns only Borland's copying of the

Lotus menu command hierarchy into its Quattro programs and

Borland's affirmative defenses to such copying. Lotus has

not cross-appealed; in other words, Lotus does not contend on

appeal that the district court erred in finding that Borland

had not copied other elements of Lotus 1-2-3, such as its

screen displays.

II. II.

Discussion Discussion

-12- 12

On appeal, Borland does not dispute that it

factually copied the words and arrangement of the Lotus menu

command hierarchy. Rather, Borland argues that it "lawfully

copied the unprotectable menus of Lotus 1-2-3." Borland

contends that the Lotus menu command hierarchy is not

copyrightable because it is a system, method of operation,

process, or procedure foreclosed from protection by 17 U.S.C.

102(b). Borland also raises a number of affirmative

defenses.

-13- 13

A. Copyright Infringement Generally

To establish copyright infringement, a plaintiff

must prove "(1) ownership of a valid copyright, and (2)

copying of constituent elements of the work that are

original." Feist Publications, Inc. v. Rural Tel. Serv. Co.,

499 U.S. 340, 361 (1991); see also Data Gen. Corp. v. Grumman

Sys. Support Corp., 36 F.3d 1147, 1160 n.19 (1st Cir. 1994);

Concrete Mach. Co. v. Classic Lawn Ornaments, Inc., 843 F.2d

600, 605 (1st Cir. 1988). To show ownership of a valid

copyright and therefore satisfy Feist's first prong, a

plaintiff must prove that the work as a whole is original and

that the plaintiff complied with applicable statutory

formalities. See Engineering Dynamics, Inc. v. Structural

Software, Inc., 26 F.3d 1335, 1340 (5th Cir. 1994). "In

judicial proceedings, a certificate of copyright registration

constitutes prima facie evidence of copyrightability and

shifts the burden to the defendant to demonstrate why the

copyright is not valid." Bibbero Sys., Inc. v. Colwell Sys.,

Inc., 893 F.2d 1104, 1106 (9th Cir. 1990); see also 17 U.S.C.

410(c); Folio Impressions, Inc. v. Byer California, 937

F.2d 759, 763 (2d Cir. 1991) (presumption of validity may be

rebutted).

To show actionable copying and therefore satisfy

Feist's second prong, a plaintiff must first prove that the

alleged infringer copied plaintiff's copyrighted work as a

-14- 14

factual matter; to do this, he or she may either present

direct evidence of factual copying or, if that is

unavailable, evidence that the alleged infringer had access

to the copyrighted work and that the offending and

copyrighted works are so similar that the court may infer

that there was factual copying (i.e., probative similarity).

Engineering Dynamics, 26 F.3d at 1340; see also Concrete

Mach., 843 F.2d at 606. The plaintiff must then prove that

the copying of copyrighted material was so extensive that it

rendered the offending and copyrighted works substantially

similar. See Engineering Dynamics, 26 F.3d at 1341.

In this appeal, we are faced only with whether the

Lotus menu command hierarchy is copyrightable subject matter

in the first instance, for Borland concedes that Lotus has a

valid copyright in Lotus 1-2-3 as a whole5 and admits to

factually copying the Lotus menu command hierarchy. As a

result, this appeal is in a very different posture from most



5. Computer programs receive copyright protection as
"literary works." See 17 U.S.C. 102(a)(1) (granting
protection to "literary works") and 17 U.S.C. 101 (defining
"literary works" as "works . . . expressed in words, numbers,
or other verbal or numerical symbols or indicia, regardless
of the nature of the material objects, such as books,
periodicals, phonorecords, film, tapes, disks, or cards, in
which they are embodied" (emphasis added)); see also H.R.
Rep. No. 1476, 94th Cong., 2d Sess. 54 (1976), reprinted in
1976 U.S.C.C.A.N. 5659, 5667 ("The term `literary works' . .
. includes computer data bases, and computer programs to the
extent that they incorporate authorship in the programmer's
expression of original ideas, as distinguished from the ideas
themselves.").

-15- 15

copyright-infringement cases, for copyright infringement

generally turns on whether the defendant has copied protected

expression as a factual matter. Because of this different

posture, most copyright-infringement cases provide only

limited help to us in deciding this appeal. This is true

even with respect to those copyright-infringement cases that

deal with computers and computer software.

B. Matter of First Impression

Whether a computer menu command hierarchy

constitutes copyrightable subject matter is a matter of first

impression in this court. While some other courts appear to

have touched on it briefly in dicta, see, e.g., Autoskill,

Inc. v. National Educ. Support Sys., Inc., 994 F.2d 1476,

1495 n.23 (10th Cir.), cert. denied, 114 S. Ct. 307 (1993),

we know of no cases that deal with the copyrightability of a

menu command hierarchy standing on its own (i.e., without

other elements of the user interface, such as screen

displays, in issue). Thus we are navigating in uncharted

waters.

Borland vigorously argues, however, that the

Supreme Court charted our course more than 100 years ago when

it decided Baker v. Selden, 101 U.S. 99 (1879). In Baker v.

Selden, the Court held that Selden's copyright over the

textbook in which he explained his new way to do accounting

-16- 16

did not grant him a monopoly on the use of his accounting

system.6 Borland argues:

The facts of Baker v. Selden, and even
the arguments advanced by the parties in
that case, are identical to those in this
case. The only difference is that the
"user interface" of Selden's system was
implemented by pen and paper rather than
by computer.

To demonstrate that Baker v. Selden and this appeal both

involve accounting systems, Borland even supplied this court

with a video that, with special effects, shows Selden's paper

forms "melting" into a computer screen and transforming into

Lotus 1-2-3.

We do not think that Baker v. Selden is nearly as

analogous to this appeal as Borland claims. Of course, Lotus

1-2-3 is a computer spreadsheet, and as such its grid of

horizontal rows and vertical columns certainly resembles an

accounting ledger or any other paper spreadsheet. Those

grids, however, are not at issue in this appeal for, unlike

Selden, Lotus does not claim to have a monopoly over its

accounting system. Rather, this appeal involves Lotus's

monopoly over the commands it uses to operate the computer.

Accordingly, this appeal is not, as Borland contends,

"identical" to Baker v. Selden.

C. Altai



6. Selden's system of double-entry bookkeeping is the now
almost-universal T-accounts system.

-17- 17

Before we analyze whether the Lotus menu command

hierarchy is a system, method of operation, process, or

procedure, we first consider the applicability of the test

the Second Circuit set forth in Computer Assoc. Int'l, Inc.

v. Altai, Inc., 982 F.2d 693 (2d Cir. 1992).7 The Second

Circuit designed its Altai test to deal with the fact that

computer programs, copyrighted as "literary works," can be

infringed by what is known as "nonliteral" copying, which is

copying that is paraphrased or loosely paraphrased rather

than word for word. See id. at 701 (citing nonliteral-

copying cases); see also 3 Melville B. Nimmer & David Nimmer,

Nimmer on Copyright 13.03[A][1] (1993). When faced with

nonliteral-copying cases, courts must determine whether

similarities are due merely to the fact that the two works

share the same underlying idea or whether they instead

indicate that the second author copied the first author's

expression. The Second Circuit designed its Altai test to

deal with this situation in the computer context,

specifically with whether one computer program copied

nonliteral expression from another program's code.



7. We consider the Altai test because both parties and many
of the amici focus on it so heavily. Borland, in particular,
is highly critical of the district court for not employing
the Altai test. Borland does not, however, indicate how
using that test would have been dispositive in Borland's
favor. Interestingly, Borland appears to contradict its own
reasoning at times by criticizing the applicability of the
Altai test.

-18- 18

The Altai test involves three steps: abstraction,

filtration, and comparison. The abstraction step requires

courts to "dissect the allegedly copied program's structure

and isolate each level of abstraction contained within it."

Altai, 982 F.2d at 707. This step enables courts to identify

the appropriate framework within which to separate

protectable expression from unprotected ideas. Second,

courts apply a "filtration" step in which they examine "the

structural components at each level of abstraction to

determine whether their particular inclusion at that level

was `idea' or was dictated by considerations of efficiency,

so as to be necessarily incidental to that idea; required by

factors external to the program itself; or taken from the

public domain." Id. Finally, courts compare the protected

elements of the infringed work (i.e., those that survived the

filtration screening) to the corresponding elements of the

allegedly infringing work to determine whether there was

sufficient copying of protected material to constitute

infringement. Id. at 710.

In the instant appeal, we are not confronted with

alleged nonliteral copying of computer code. Rather, we are

faced with Borland's deliberate, literal copying of the Lotus

menu command hierarchy. Thus, we must determine not whether

nonliteral copying occurred in some amorphous sense, but

-19- 19

rather whether the literal copying of the Lotus menu command

hierarchy constitutes copyright infringement.

While the Altai test may provide a useful framework

for assessing the alleged nonliteral copying of computer

code, we find it to be of little help in assessing whether

the literal copying of a menu command hierarchy constitutes

copyright infringement. In fact, we think that the Altai

test in this context may actually be misleading because, in

instructing courts to abstract the various levels, it seems

to encourage them to find a base level that includes

copyrightable subject matter that, if literally copied, would

make the copier liable for copyright infringement.8 While

that base (or literal) level would not be at issue in a

nonliteral-copying case like Altai, it is precisely what is

at issue in this appeal. We think that abstracting menu

command hierarchies down to their individual word and menu

levels and then filtering idea from expression at that stage,

as both the Altai and the district court tests require,

obscures the more fundamental question of whether a menu

command hierarchy can be copyrighted at all. The initial



8. We recognize that Altai never states that every work
contains a copyrightable "nugget" of protectable expression.
Nonetheless, the implication is that for literal copying, "it
is not necessary to determine the level of abstraction at
which similarity ceases to consist of an `expression of
ideas,' because literal similarity by definition is always a
similarity as to the expression of ideas." 3 Melville B.
Nimmer & David Nimmer, Nimmer on Copyright 13.03[A](2)
(1993).

-20- 20

inquiry should not be whether individual components of a menu

command hierarchy are expressive, but rather whether the menu

command hierarchy as a whole can be copyrighted. But see

Gates Rubber Co. v. Bando Chem. Indus., Ltd., 9 F.3d 823

(10th Cir. 1993) (endorsing Altai's abstraction-filtration-

comparison test as a way of determining whether "menus and

sorting criteria" are copyrightable).

D. The Lotus Menu Command Hierarchy: A "Method of

Operation"

Borland argues that the Lotus menu command

hierarchy is uncopyrightable because it is a system, method

of operation, process, or procedure foreclosed from copyright

protection by 17 U.S.C. 102(b). Section 102(b) states:

"In no case does copyright protection for an original work of

authorship extend to any idea, procedure, process, system,

method of operation, concept, principle, or discovery,

regardless of the form in which it is described, explained,

illustrated, or embodied in such work." Because we conclude

that the Lotus menu command hierarchy is a method of

operation, we do not consider whether it could also be a

system, process, or procedure.

We think that "method of operation," as that term

is used in 102(b), refers to the means by which a person

operates something, whether it be a car, a food processor, or

a computer. Thus a text describing how to operate something

-21- 21

would not extend copyright protection to the method of

operation itself; other people would be free to employ that

method and to describe it in their own words. Similarly, if

a new method of operation is used rather than described,

other people would still be free to employ or describe that

method.

We hold that the Lotus menu command hierarchy is an

uncopyrightable "method of operation." The Lotus menu

command hierarchy provides the means by which users control

and operate Lotus 1-2-3. If users wish to copy material, for

example, they use the "Copy" command. If users wish to print

material, they use the "Print" command. Users must use the

command terms to tell the computer what to do. Without the

menu command hierarchy, users would not be able to access and

control, or indeed make use of, Lotus 1-2-3's functional

capabilities.

The Lotus menu command hierarchy does not merely

explain and present Lotus 1-2-3's functional capabilities to

the user; it also serves as the method by which the program

is operated and controlled. The Lotus menu command hierarchy

is different from the Lotus long prompts, for the long

prompts are not necessary to the operation of the program;

users could operate Lotus 1-2-3 even if there were no long

-22- 22

prompts.9 The Lotus menu command hierarchy is also

different from the Lotus screen displays, for users need not

"use" any expressive aspects of the screen displays in order

to operate Lotus 1-2-3; because the way the screens look has

little bearing on how users control the program, the screen

displays are not part of Lotus 1-2-3's "method of

operation."10 The Lotus menu command hierarchy is also

different from the underlying computer code, because while

code is necessary for the program to work, its precise

formulation is not. In other words, to offer the same

capabilities as Lotus 1-2-3, Borland did not have to copy

Lotus's underlying code (and indeed it did not); to allow

users to operate its programs in substantially the same way,

however, Borland had to copy the Lotus menu command

hierarchy. Thus the Lotus 1-2-3 code is not a

uncopyrightable "method of operation."11



9. As the Lotus long prompts are not before us on appeal, we
take no position on their copyrightability, although we do
note that a strong argument could be made that the brief
explanations they provide "merge" with the underlying idea of
explaining such functions. See Morrissey v. Procter & Gamble
Co., 379 F.2d 675, 678-79 (1st Cir. 1967) (when the possible
ways to express an idea are limited, the expression "merges"
with the idea and is therefore uncopyrightable; when merger
occurs, identical copying is permitted).

10. As they are not before us on appeal, we take no position
on whether the Lotus 1-2-3 screen displays constitute
original expression capable of being copyrighted.

11. Because the Lotus 1-2-3 code is not before us on appeal,
we take no position on whether it is copyrightable. We note,
however, that original computer codes generally are protected

-23- 23

The district court held that the Lotus menu command

hierarchy, with its specific choice and arrangement of

command terms, constituted an "expression" of the "idea" of

operating a computer program with commands arranged

hierarchically into menus and submenus. Borland II, 799 F.

Supp. at 216. Under the district court's reasoning, Lotus's

decision to employ hierarchically arranged command terms to

operate its program could not foreclose its competitors from

also employing hierarchically arranged command terms to

operate their programs, but it did foreclose them from

employing the specific command terms and arrangement that

Lotus had used. In effect, the district court limited Lotus

1-2-3's "method of operation" to an abstraction.

Accepting the district court's finding that the

Lotus developers made some expressive choices in choosing and

arranging the Lotus command terms, we nonetheless hold that

that expression is not copyrightable because it is part of

Lotus 1-2-3's "method of operation." We do not think that

"methods of operation" are limited to abstractions; rather,

they are the means by which a user operates something. If

specific words are essential to operating something, then

they are part of a "method of operation" and, as such, are



by copyright. See, e.g., Altai, 982 F.2d at 702 ("It is now
well settled that the literal elements of computer programs,
i.e., their source and object codes, are the subject of
copyright protection.") (citing cases).

-24- 24

unprotectable. This is so whether they must be highlighted,

typed in, or even spoken, as computer programs no doubt will

soon be controlled by spoken words.

The fact that Lotus developers could have designed

the Lotus menu command hierarchy differently is immaterial to

the question of whether it is a "method of operation." In

other words, our initial inquiry is not whether the Lotus

menu command hierarchy incorporates any expression.12

Rather, our initial inquiry is whether the Lotus menu command

hierarchy is a "method of operation." Concluding, as we do,

that users operate Lotus 1-2-3 by using the Lotus menu

command hierarchy, and that the entire Lotus menu command

hierarchy is essential to operating Lotus 1-2-3, we do not

inquire further whether that method of operation could have

been designed differently. The "expressive" choices of what

to name the command terms and how to arrange them do not

magically change the uncopyrightable menu command hierarchy

into copyrightable subject matter.

Our holding that "methods of operation" are not

limited to mere abstractions is bolstered by Baker v. Selden.

In Baker, the Supreme Court explained that 

the teachings of science and the rules
and methods of useful art have their
final end in application and use; and
this application and use are what the



12. We think that the Altai test would contemplate this
being the initial inquiry.

-25- 25

public derive from the publication of a
book which teaches them. . . . The
description of the art in a book, though
entitled to the benefit of copyright,
lays no foundation for an exclusive claim
to the art itself. The object of the one
is explanation; the object of the other
is use. The former may be secured by
copyright. The latter can only be
secured, if it can be secured at all, by
letters-patent.

Baker v. Selden, 101 U.S. at 104-05. Lotus wrote its menu

command hierarchy so that people could learn it and use it.

Accordingly, it falls squarely within the prohibition on

copyright protection established in Baker v. Selden and

codified by Congress in 102(b).

In many ways, the Lotus menu command hierarchy is

like the buttons used to control, say, a video cassette

recorder ("VCR"). A VCR is a machine that enables one to

watch and record video tapes. Users operate VCRs by pressing

a series of buttons that are typically labelled "Record,

Play, Reverse, Fast Forward, Pause, Stop/Eject." That the

buttons are arranged and labeled does not make them a

"literary work," nor does it make them an "expression" of the

abstract "method of operating" a VCR via a set of labeled

buttons. Instead, the buttons are themselves the "method of

operating" the VCR.

When a Lotus 1-2-3 user chooses a command, either

by highlighting it on the screen or by typing its first

letter, he or she effectively pushes a button. Highlighting

-26- 26

the "Print" command on the screen, or typing the letter "P,"

is analogous to pressing a VCR button labeled "Play."

Just as one could not operate a buttonless VCR, it

would be impossible to operate Lotus 1-2-3 without employing

its menu command hierarchy. Thus the Lotus command terms are

not equivalent to the labels on the VCR's buttons, but are

instead equivalent to the buttons themselves. Unlike the

labels on a VCR's buttons, which merely make operating a VCR

easier by indicating the buttons' functions, the Lotus menu

commands are essential to operating Lotus 1-2-3. Without the

menu commands, there would be no way to "push" the Lotus

buttons, as one could push unlabeled VCR buttons. While

Lotus could probably have designed a user interface for which

the command terms were mere labels, it did not do so here.

Lotus 1-2-3 depends for its operation on use of the precise

command terms that make up the Lotus menu command hierarchy.

One might argue that the buttons for operating a

VCR are not analogous to the commands for operating a

computer program because VCRs are not copyrightable, whereas

computer programs are. VCRs may not be copyrighted because

they do not fit within any of the 102(a) categories of

copyrightable works; the closest they come is "sculptural

work." Sculptural works, however, are subject to a "useful-

article" exception whereby "the design of a useful article .

. . shall be considered a pictorial, graphic, or sculptural

-27- 27

work only if, and only to the extent that, such design

incorporates pictorial, graphic, or sculptural features that

can be identified separately from, and are capable of

existing independently of, the utilitarian aspects of the

article." 17 U.S.C. 101. A "useful article" is "an

article having an intrinsic utilitarian function that is not

merely to portray the appearance of the article or to convey

information." Id. Whatever expression there may be in the

arrangement of the parts of a VCR is not capable of existing

separately from the VCR itself, so an ordinary VCR would not

be copyrightable.

Computer programs, unlike VCRs, are copyrightable

as "literary works." 17 U.S.C. 102(a). Accordingly, one

might argue, the "buttons" used to operate a computer program

are not like the buttons used to operate a VCR, for they are

not subject to a useful-article exception. The response, of

course, is that the arrangement of buttons on a VCR would not

be copyrightable even without a useful-article exception,

because the buttons are an uncopyrightable "method of

operation." Similarly, the "buttons" of a computer program

are also an uncopyrightable "method of operation."

That the Lotus menu command hierarchy is a "method

of operation" becomes clearer when one considers program

compatibility. Under Lotus's theory, if a user uses several

different programs, he or she must learn how to perform the

-28- 28

same operation in a different way for each program used. For

example, if the user wanted the computer to print material,

then the user would have to learn not just one method of

operating the computer such that it prints, but many

different methods. We find this absurd. The fact that there

may be many different ways to operate a computer program, or

even many different ways to operate a computer program using

a set of hierarchically arranged command terms, does not make

the actual method of operation chosen copyrightable; it still

functions as a method for operating the computer and as such

is uncopyrightable.

Consider also that users employ the Lotus menu

command hierarchy in writing macros. Under the district

court's holding, if the user wrote a macro to shorten the

time needed to perform a certain operation in Lotus 1-2-3,

the user would be unable to use that macro to shorten the

time needed to perform that same operation in another

program. Rather, the user would have to rewrite his or her

macro using that other program's menu command hierarchy.

This is despite the fact that the macro is clearly the user's

own work product. We think that forcing the user to cause

the computer to perform the same operation in a different way

ignores Congress's direction in 102(b) that "methods of

operation" are not copyrightable. That programs can offer

users the ability to write macros in many different ways does

-29- 29

not change the fact that, once written, the macro allows the

user to perform an operation automatically. As the Lotus

menu command hierarchy serves as the basis for Lotus 1-2-3

macros, the Lotus menu command hierarchy is a "method of

operation."

In holding that expression that is part of a

"method of operation" cannot be copyrighted, we do not

understand ourselves to go against the Supreme Court's

holding in Feist. In Feist, the Court explained:

The primary objective of copyright is not
to reward the labor of authors, but to
promote the Progress of Science and
useful Arts. To this end, copyright
assures authors the right to their
original expression, but encourages
others to build freely upon the ideas and
information conveyed by a work.

Feist, 499 U.S. at 349-50 (quotations and citations omitted).

We do not think that the Court's statement that "copyright

assures authors the right to their original expression"

indicates that all expression is necessarily copyrightable;

while original expression is necessary for copyright

protection, we do not think that it is alone sufficient.

Courts must still inquire whether original expression falls

within one of the categories foreclosed from copyright

protection by 102(b), such as being a "method of

operation."

We also note that in most contexts, there is no

need to "build" upon other people's expression, for the ideas

-30- 30

conveyed by that expression can be conveyed by someone else

without copying the first author's expression.13 In the

context of methods of operation, however, "building" requires

the use of the precise method of operation already employed;

otherwise, "building" would require dismantling, too.

Original developers are not the only people entitled to build

on the methods of operation they create; anyone can. Thus,

Borland may build on the method of operation that Lotus

designed and may use the Lotus menu command hierarchy in

doing so.

Our holding that methods of operation are not

limited to abstractions goes against Autoskill, 994 F.2d at

1495 n.23, in which the Tenth Circuit rejected the

defendant's argument that the keying procedure used in a

computer program was an uncopyrightable "procedure" or

"method of operation" under 102(b). The program at issue,

which was designed to test and train students with reading

deficiencies, id. at 1481, required students to select

responses to the program's queries "by pressing the 1, 2, or

3 keys." Id. at 1495 n.23. The Tenth Circuit held that,

"for purposes of the preliminary injunction, . . . the record

showed that [this] keying procedure reflected at least a

minimal degree of creativity," as required by Feist for



13. When there are a limited number of ways to express an
idea, however, the expression "merges" with the idea and
becomes uncopyrightable. Morrissey, 379 F.2d at 678-79.

-31- 31

copyright protection. Id. As an initial matter, we question

whether a programmer's decision to have users select a

response by pressing the 1, 2, or 3 keys is original. More

importantly, however, we fail to see how "a student

select[ing] a response by pressing the 1, 2, or 3 keys," id.,

can be anything but an unprotectable method of operation.14

III. III.

Conclusion Conclusion

Because we hold that the Lotus menu command

hierarchy is uncopyrightable subject matter, we further hold

that Borland did not infringe Lotus's copyright by copying

it. Accordingly, we need not consider any of Borland's

affirmative defenses. The judgment of the district court is

Reversed.

Concurrence

follows. 



14. The Ninth Circuit has also indicated in dicta that
"menus, and keystrokes" may be copyrightable. Brown Bag
Software v. Symantec Corp., 960 F.2d 1465, 1477 (9th Cir.),
cert. denied, BB Asset Management, Inc. v. Symantec Corp.,
113 S. Ct. 198 (1992). In that case, however, the plaintiff
did not show that the defendant had copied the plaintiff's
menus or keystrokes, so the court was not directly faced with
whether the menus or keystrokes constituted an unprotectable
method of operation. Id.

-32- 32

BOUDIN, Circuit Judge, concurring. The importance of

this case, and a slightly different emphasis in my view of

the underlying problem, prompt me to add a few words to the

majority's tightly focused discussion.

I.

Most of the law of copyright and the "tools" of analysis

have developed in the context of literary works such as

novels, plays, and films. In this milieu, the principal

problem--simply stated, if difficult to resolve--is to

stimulate creative expression without unduly limiting access

by others to the broader themes and concepts deployed by the

author. The middle of the spectrum presents close cases; but

a "mistake" in providing too much protection involves a small

cost: subsequent authors treating the same themes must take

a few more steps away from the original expression.

The problem presented by computer programs is

fundamentally different in one respect. The computer program

is a means for causing something to happen; it has a

mechanical utility, an instrumental role, in accomplishing

the world's work. Granting protection, in other words, can

have some of the consequences of patent protection in

limiting other people's ability to perform a task in the most

efficient manner. Utility does not bar copyright

-31- -31-

(dictionaries may be copyrighted), but it alters the

calculus.

Of course, the argument for protection is undiminished,

perhaps even enhanced, by utility: if we want more of an

intellectual product, a temporary monopoly for the creator

provides incentives for others to create other, different

items in this class. But the "cost" side of the equation may

be different where one places a very high value on public

access to a useful innovation that may be the most efficient

means of performing a given task. Thus, the argument for

extending protection may be the same; but the stakes on the

other side are much higher.

It is no accident that patent protection has

preconditions that copyright protection does not--notably,

the requirements of novelty and non-obviousness--and that

patents are granted for a shorter period than copyrights.

This problem of utility has sometimes manifested itself in

copyright cases, such as Baker v. Selden, 101 U.S. 99 (1879),

and been dealt with through various formulations that limit

copyright or create limited rights to copy. But the case law

and doctrine addressed to utility in copyright have been

brief detours in the general march of copyright law.

Requests for the protection of computer menus present

the concern with fencing off access to the commons in an

acute form. A new menu may be a creative work, but over time

-32- -32-

its importance may come to reside more in the investment that

has been made by users in learning the menu and in building

their own mini-programs--macros--in reliance upon the menu.

Better typewriter keyboard layouts may exist, but the

familiar QWERTY keyboard dominates the market because that is

what everyone has learned to use. See P. David, CLIO and the

Economics of QWERTY, 75 Am. Econ. Rev. 332 (1985). The

QWERTY keyboard is nothing other than a menu of letters.

Thus, to assume that computer programs are just one more

new means of expression, like a filmed play, may be quite

wrong. The "form"--the written source code or the menu

structure depicted on the screen--look hauntingly like the

familiar stuff of copyright; but the "substance" probably has

more to do with problems presented in patent law or, as

already noted, in those rare cases where copyright law has

confronted industrially useful expressions. Applying

copyright law to computer programs is like assembling a

jigsaw puzzle whose pieces do not quite fit.

All of this would make no difference if Congress had

squarely confronted the issue, and given explicit directions

as to what should be done. The Copyright Act of 1976 took a

different course. While Congress said that computer programs

might be subject to copyright protection, it said this in

very general terms; and, especially in 102(b), Congress

adopted a string of exclusions that if taken literally might

-33- -33-

easily seem to exclude most computer programs from

protection. The only detailed prescriptions for computers

involve narrow issues (like back-up copies) of no relevance

here.

Of course, one could still read the statute as a

congressional command that the familiar doctrines of

copyright law be taken and applied to computer programs, in

cookie cutter fashion, as if the programs were novels or play

scripts. Some of the cases involving computer programs

embody this approach. It seems to me mistaken on two

different grounds: the tradition of copyright law, and the

likely intent of Congress.

The broad-brush conception of copyright protection, the

time limits, and the formalities have long been prescribed by

statute. But the heart of copyright doctrine--what may be

protected and with what limitations and exceptions--has been

developed by the courts through experience with individual

cases. B. Kaplan, An Unhurried View of Copyright 40 (1967).

Occasionally Congress addresses a problem in detail. For the

most part the interstitial development of copyright through

the courts is our tradition.

Nothing in the language or legislative history of the

1976 Act, or at least nothing brought to our attention,

suggests that Congress meant the courts to abandon this case-

by-case approach. Indeed, by setting up 102(b) as a

-34- -34-

counterpoint theme, Congress has arguably recognized the

tension and left it for the courts to resolve through the

development of case law. And case law development is

adaptive: it allows new problems to be solved with help of

earlier doctrine, but it does not preclude new doctrines to

meet new situations.

II.

In this case, the raw facts are mostly, if not entirely,

undisputed. Although the inferences to be drawn may be more

debatable, it is very hard to see that Borland has shown any

interest in the Lotus menu except as a fall-back option for

those users already committed to it by prior experience or in

order to run their own macros using 1-2-3 commands. At least

for the amateur, accessing the Lotus menu in the Borland

Quattro or Quattro Pro program takes some effort.

Put differently, it is unlikely that users who value the

Lotus menu for its own sake--independent of any investment

they have made themselves in learning Lotus' commands or

creating macros dependent upon them--would choose the Borland

program in order to secure access to the Lotus menu.

Borland's success is due primarily to other features. Its

rationale for deploying the Lotus menu bears the ring of

truth.

Now, any use of the Lotus menu by Borland is a

commercial use and deprives Lotus of a portion of its

-35- -35-

"reward," in the sense that an infringement claim if allowed

would increase Lotus' profits. But this is circular

reasoning: broadly speaking, every limitation on copyright or

privileged use diminishes the reward of the original creator.

Yet not every writing is copyrightable or every use an

infringement. The provision of reward is one concern of

copyright law, but it is not the only one. If it were,

copyrights would be perpetual and there would be no

exceptions.

The present case is an unattractive one for copyright

protection of the menu. The menu commands (e.g., "print,"

"quit") are largely for standard procedures that Lotus did

not invent and are common words that Lotus cannot monopolize.

What is left is the particular combination and sub-grouping

of commands in a pattern devised by Lotus. This arrangement

may have a more appealing logic and ease of use than some

other configurations; but there is a certain arbitrariness to

many of the choices.

If Lotus is granted a monopoly on this pattern, users

who have learned the command structure of Lotus 1-2-3 or

devised their own macros are locked into Lotus, just as a

typist who has learned the QWERTY keyboard would be the

captive of anyone who had a monopoly on the production of

such a keyboard. Apparently, for a period Lotus 1-2-3 has

had such sway in the market that it has represented the de

-36- -36-

facto standard for electronic spreadsheet commands. So long

as Lotus is the superior spreadsheet--either in quality or in

price--there may be nothing wrong with this advantage.

But if a better spreadsheet comes along, it is hard to

see why customers who have learned the Lotus menu and devised

macros for it should remain captives of Lotus because of an

investment in learning made by the users and not by Lotus.

Lotus has already reaped a substantial reward for being

first; assuming that the Borland program is now better, good

reasons exist for freeing it to attract old Lotus customers:

to enable the old customers to take advantage of a new

advance, and to reward Borland in turn for making a better

product. If Borland has not made a better product, then

customers will remain with Lotus anyway.

Thus, for me the question is not whether Borland should

prevail but on what basis. Various avenues might be

traveled, but the main choices are between holding that the

menu is not protectable by copyright and devising a new

doctrine that Borland's use is privileged. No solution is

perfect and no intermediate appellate court can make the

final choice.

To call the menu a "method of operation" is, in the

common use of those words, a defensible position. After all,

the purpose of the menu is not to be admired as a work of

literary or pictorial art. It is to transmit directions from

-37- -37-

the user to the computer, i.e., to operate the computer. The

menu is also a "method" in the dictionary sense because it is

a "planned way of doing something," an "order or system," and

(aptly here) an "orderly or systematic arrangement, sequence

or the like." Random House Webster's College Dictionary 853

(1991).

A different approach would be to say that Borland's use

is privileged because, in the context already described, it

is not seeking to appropriate the advances made by Lotus'

menu; rather, having provided an arguably more attractive

menu of its own, Borland is merely trying to give former

Lotus users an option to exploit their own prior investment

in learning or in macros. The difference is that such a

privileged use approach would not automatically protect

Borland if it had simply copied the Lotus menu (using

different codes), contributed nothing of its own, and resold

Lotus under the Borland label.

The closest analogue in conventional copyright is the

fair use doctrine. E.g., Harper & Row, Publishers, Inc. v.

Nation Enters., 471 U.S. 539 (1985). Although invoked by

Borland, it has largely been brushed aside in this case

because the Supreme Court has said that it is "presumptively"

unavailable where the use is a "commercial" one. See id. at

562. But see Campbell v. Acuff-Rose Music, Inc., 114 S. Ct.

1164, 1174 (1994). In my view, this is something less than a

-38- -38-

definitive answer; "presumptively" does not mean "always"

and, in any event, the doctrine of fair use was created by

the courts and can be adapted to new purposes.

But a privileged use doctrine would certainly involve

problems of its own. It might more closely tailor the limits

on copyright protection to the reasons for limiting that

protection; but it would entail a host of administrative

problems that would cause cost and delay, and would also

reduce the ability of the industry to predict outcomes.

Indeed, to the extent that Lotus' menu is an important

standard in the industry, it might be argued that any use

ought to be deemed privileged.

In sum, the majority's result persuades me and its

formulation is as good, if not better, than any other that

occurs to me now as within the reach of courts. Some

solutions (e.g., a very short copyright period for menus) are

not options at all for courts but might be for Congress. In

all events, the choices are important ones of policy, not

linguistics, and they should be made with the underlying

considerations in view.

-39- -39-